IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANDREW JON THOMASBERG,<br><br>Defendant. | Case No. 1:19-cr-337<br><br>The Honorable Liam O'Grady<br><br>Sentencing: February 28, 2020 |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines"), § 6A1.2, files this Position of the United States with Respect to Sentencing in the instant case. The defendant has pleaded guilty to making a material false statement in relation to the purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6), and possessing firearms while being an unlawful user of or addicted to controlled substances, in violation of 18 U.S.C. § 922(g)(3). The United States has no objection to the Guidelines' calculation and factual information contained in the Presentence Investigation Report, which accurately reflects that the defendant's advisory Guidelines range is twelve to eighteen months. The United States submits that this sentencing range is reasonable and appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553(a). The United States respectfully requests that this Court impose a sentence of eighteen months of imprisonment and a three-year term of supervised release.

**BACKGROUND AND PROCEDURAL HISTORY**

On September 18, 2019, the United States charged the defendant, by criminal complaint, with making a false statement during the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6), and possession of firearms by a controlled substance abuser, in violation of 18 U.S.C. § 922(g)(3). *See* Docket Entry ("DE") 1. On November 12, 2019, the defendant appeared before

1

the Court and pleaded guilty to the same two charges. *See* DE 28. The defendant has been detained since his September 19, 2019 arrest, pursuant to a Temporary Detention Order and an Order of Detention Pending Trial, both signed by the Honorable Theresa Carroll Buchanan, United States Magistrate Judge. *See* DEs 10, 14.

With respect to the Section 922(a)(6) charge ("Count One"), in the Statement of Facts filed in this case, the defendant admitted that, on October 18, 2017, he purchased an Arsenal SAM7R, 7.62x39 caliber, semiautomatic rifle. DE 27, ¶ 2. In purchasing this firearm, the defendant completed paperwork required by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), specifically an ATF Form 4473. *Id.* On the ATF Form 4473, the defendant knowingly lied when he indicated that he was the actual buyer of the firearm. *Id.* ¶¶ 2–3. In fact, as the defendant well knew, the firearm was never intended for the defendant, and he was purchasing the firearm for another person, Individual B.B. *Id.* ¶ 3. Individual B.B. directed the defendant in making the purchase and even paid for the firearm with his own credit card. *Id.* Shortly after picking up the firearm from a gun store—according to Individual B.B., within a few days or weeks—the defendant transferred it to Individual B.B. *See id.* At the time of the transfer, a bill of sale was completed, which documented the transfer price for this firearm—which was originally purchased for $1,336.19—as $14.88.[1] In a subsequent interview with law enforcement, Individual B.B. identified the transaction as a "straw purchase."

With respect to the Section 922(g)(3) charge ("Count Two"), the defendant has admitted to knowingly and unlawfully possessing at least four firearms between November 2018 and March

---

[1] "1488 is a combination of two popular white supremacist numeric symbols. The first symbol is 14, which is shorthand for the '14 Words' slogan: 'We must secure the existence of our people and a future for white children.' The second is 88, which stands for 'Heil Hitler' (H being the 8th letter of the alphabet). Together, the numbers form a general endorsement of white supremacy and its beliefs. . . . Some white supremacists will even price racist merchandise, such as t-shirts or compact discs, for $14.88." "1488," ADL.ORG, https://www.adl.org/education/references/-hate-symbols/1488 (last visited February 21, 2020).

2019. DE 27, ¶ 5. During that time, the defendant was an unlawful user of or addicted to a variety of controlled substances, including marijuana, Modafinil, psilocybin mushrooms, and opium. *Id.* ¶ 6.

## LEGAL STANDARD

Even though the Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 224 (2005). "[A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553 states that the court should consider the nature and circumstances of the offense and history and characteristics of the defendant. In addition, the court must consider other factors, including the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B). The sentence should also protect the public from further crimes of the defendant, and provide the defendant with needed correctional treatment. 18 U.S.C. § 3553(a)(2)(C) & (D).

## SENTENCING GUIDELINES

### A.     The Advisory Guidelines Range.

The United States and the United States Probation Office ("Probation") agree as to the applicable Guidelines in this case. The United States agrees with Probation that, pursuant to Guidelines Section 3D1.2(d), Counts One and Two are grouped for purposes of calculating the Guidelines. Further, the United States and Probation agree that, pursuant to the terms of the plea agreement: The applicable Guidelines provision for Count Two is Section 2K2.1, and the base offense level is fourteen. Guidelines § 2K2.1(a)(6). Moreover, because Count Two involved

between three and seven firearms, the offense level is increased by two. Guidelines § 2K2.1(b)(1)(C). In addition, because the defendant assisted the United States in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the defendant qualifies for a two-level decrease in offense level pursuant to Guidelines Section 3E1.1(a), and the United States hereby moves the Court to award an additional one-level decrease in the offense level pursuant to Guidelines Section 3E1.1(b).

This Guidelines calculation results in an adjusted offense level of sixteen and a total offense level of thirteen. After determining the defendant's criminal history to be at Category I, Probation properly identified the Guidelines range to be twelve to eighteen months' imprisonment.

### B. The Defendant's Unlawful Possession of Firearms Was Not Solely for Lawful Sporting Purposes or Collection.

Despite the findings of Probation, the defendant objects to the Guidelines calculation, arguing that the defendant should receive a reduction under Guidelines Section 2K2.1(b)(2), because, he claims, he possessed his firearms solely for lawful sporting purposes or collection. The United States concurs with Probation that the defendant's objection is without merit.

Under the Guidelines, a substantial reduction in offense level is available if the defendant "possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition." Guidelines § 2K2.1(b)(2).[2] The Guidelines provide that application of this reduction is "determined by the surrounding circumstances." Guidelines § 2K2.1 app. note 6. The Guidelines explain,

---

[2] In this case, application of this reduction would bring the defendant's adjusted offense level down from sixteen to six. After applying the reduction for acceptance of responsibility under Section 3E1.1(a), the defendant's total offense level would be four. The Guidelines would, under those circumstances, recommend a term of imprisonment of zero to six months.

"Relevant surrounding circumstances include the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (*e.g.*, prior convictions for offenses involving firearms), and the extent to which possession was restricted by local law." *Id.* The defendant bears the burden of justifying this sentence reduction. *See, e.g.*, *United States v. Tuck*, 87 F. App'x 303, 304 (4th Cir. 2003).

The defendant has not carried his burden of demonstrating he is entitled to this reduction. To the contrary, the evidence in this case clearly proves that he did not possess the subject firearms solely for lawful sporting purposes or collection. First, as the Fourth Circuit has emphasized, this reduction applies "only if a firearm is possessed '*solely* for lawful sporting purposes or collection'—and no other purpose." *United States v. Solomon*, 274 F.3d 825, 828 (4th Cir. 2001) (quoting Guidelines § 2K2.1(b)(2)). The defendant himself has suggested that he was amassing an arsenal of weapons to prepare for "rahowa"—what he views as a coming "racial holy war." *See* Gov't Exs. 1–4. Accumulating weapons in preparation for war is not "sporting," nor is it "collection." Even possessing firearms that are, in part, for purposes of protection or self-defense would not qualify for the reduction the defendant seeks here. *See United States v. Coley*, 981 F.2d 1252, 1992 WL 372292, at *2 (4th Cir. 2000) (citing, approvingly, *United States v. Cousens*, 942 F.2d 800, 801–04 (1st Cir. 1991), for the proposition that securing firearms for self-defense does not constitute lawful sporting purposes or collection).[3]

---

[3] Other circuits to address this issue have reached the same common sense conclusion. *See, e.g.*, *United States v. Wyckoff*, 918 F.2d 925, 928 (11th Cir. 1990) ("[D]efense or self-protection is not sport or recreation."); *United States v. Kissinger*, 986 F.2d 1244, 1246 (8th Cir. 1993); *United States v. Lam*, 20 F.3d 999, 1002 (9th Cir. 1994); *United States v. Shugart*, 25 F.3d 1054, 1994 WL 175416, at *4 (7th Cir. 1994) ("A firearm acquired and intended solely for lawful sporting purposes does not qualify under § 2K2.1(b)(2) when the defendant also uses the gun for personal protection."); *United States v. Halpin*, 139 F.3d 310, 311 (2d Cir. 1996) ("Because Halpin has conceded that protection, of himself or another, was one reason for his possession of the gun, he cannot be heard here to argue that the sole reason for his possession of the gun was sporting.");

Second, the relevant factors set out by the Guidelines themselves demonstrate why the defendant's argument for the reduction is fatally flawed. In particular, the volume of firearms and ammunition recovered in this case—and their locations at the time of recovery—demonstrate that the defendant was not a mere collector or sportsman. *See* Guidelines § 2K2.1 app. note 6 (identifying "the number and type of firearms," "the amount and type of ammunition," and "the location and circumstances of possession" as relevant factors). When the defendant was arrested on September 19, 2019, law enforcement recovered several firearms, including rifles and pistols, from the defendant's bedroom and adjoining room—including three firearms from next to the defendant's bed, two more from his bedroom closet, another in a desk in his adjoining room, and another under that desk. In addition, law enforcement recovered, from just the defendant's bedroom and adjoining room, forty-seven separate magazines for various firearms, the vast majority of which were loaded with rounds of ammunition. Law enforcement also recovered a Glock 23, .40 caliber pistol, with a loaded magazine inside, from the glove box of the defendant's vehicle. Two more magazines were in the center console, another two in the passenger door, and yet another in the trunk of the vehicle. Four more of the defendant's firearms were turned over to law enforcement from another residence, and another firearm the defendant owned was at a gun repair shop. The large number of firearms recovered, the type of firearms, the large quantity of ammunition, and the fact that the defendant had a firearm and ammunition in his car indicate he was not possessing firearms solely for lawful sporting purposes or collection.[4]

---

*United States v. Vertz*, 40 F. App'x 69, 76 (6th Cir. 2002) ("In order to defeat application of the sporting/collection reduction, it is enough that Vertz used at least one gun from his collection for perceived self-defense purposes.").

[4] The locations of the firearms are noteworthy given that the home where the defendant resided had a basement vault where many firearms were stored. If the defendant, as he claims, were a mere collector of firearms, it is striking that he would keep firearms next to his bed, in his closet, in a desk drawer, under a desk, and in his car—all places consistent with ready access for use—rather than stored in a vault.

The defendant's criminal history also counsels strongly against the reduction. *See* Guidelines § 2K2.1 app. note 6 (identifying "the defendant's criminal history (*e.g.*, prior convictions for offenses involving firearms)" as a relevant factor). On May 30, 2013, the defendant pleaded guilty to a dangerous firearms offense as a juvenile. The conviction stemmed from a February 10, 2013 incident in which the defendant met three other individuals with the plan to sell them marijuana. When the individuals took the marijuana and drove off without paying, the defendant pulled out a handgun and fired a shot at the vehicle. Given that the defendant's criminal history includes an incident in which the defendant discharged a firearm in an attempted violent crime, the claimed reduction is not appropriate. *See United States v. Organ*, 230 F.3d 1356, 2000 WL 1350660, at *1 (4th Cir. 2000) (rejecting application of the reduction where the defendant "had a history of violence").

Finally, the defendant purchased and briefly possessed one firearm with the express purpose of unlawfully transferring it to another individual. This fact, too, demonstrates that the defendant was not possessing firearms solely for lawful sporting purposes or collection. *See United States v. Fredman*, 61 F. App'x 82, 84 (4th Cir. 2003) (holding that the reduction does not apply where the defendant "pawned the firearms"); *United States v. Smith*, 914 F.2d 250, 1990 WL 135666, at *2 (4th Cir. 1990) (holding that the reduction was not appropriate where the defendant "sold the guns for cash").

Accordingly, the Court should embrace the findings of Probation and reject the defendant's request for a reduction under Guidelines Section 2K2.1(b)(2), because the defendant has not demonstrated that he possessed his firearms solely for lawful sporting purposes or collection.

## 18 U.S.C. § 3553(a) FACTORS

**A.  A Substantial Term of Imprisonment Is Necessary To Account for the Serious Nature and Circumstances of the Offense, Promote Respect for the Law, and Accomplish the Goal of Deterrence.**

A substantial term of imprisonment is appropriate and reasonable given the serious nature of the defendant's crime. As reflected in the Statement of Facts, between November 2018 and March 2019, the defendant was an unlawful user of or addicted to a number of controlled substances, including marijuana, Modafinil, psilocybin mushrooms, and opium.[5] During that time period, the defendant possessed a variety of firearms, including four specifically set out in the Statement of Facts.[6] In his post-arrest interview, the defendant admitted that, until the time of his arrest, he generally carried a firearm on him. The combination of drug use and firearms presents a serious danger to the community. *See United States v. Carter*, 750 F.3d 462, 470 (4th Cir. 2014) (concluding that "empirical evidence and common sense support the government's contention that drug use, including marijuana use, frequently coincides with violence"). The fact that the defendant himself was involved in an attempted drug transaction in which he shot at an occupied vehicle illustrates precisely why the combination of firearms and drugs is so dangerous. It is, therefore, important that the sentence imposed reflect the inherently dangerous nature of that offense and afford adequate deterrence.

---

[5] The defendant has also admitted to law enforcement that he regularly used LSD in the past, though he claims he had not used LSD during the November 2018 to March 2019 time period covered by the Criminal Information.

[6] In fact, the defendant possessed more firearms than just those outlined in the Statement of Facts. Specifically, according to the defendant's text message communications, on March 24, 2019, the defendant traveled to Richmond, VA and traded a Saiga rifle for another weapon. *See* Gov't Ex. 5. Moreover, as noted above, at the time of his arrest, the defendant possessed at least twelve firearms—including the four identified in the Statement of Facts. While it is possible the defendant possessed some of the firearms not identified in the Statement of Facts during the relevant time period, law enforcement has been unable to identify the date of purchase or first possession for these firearms.

Moreover, the defendant has also pleaded guilty to lying in order to straw purchase a firearm for another person, Individual B.B., on October 18, 2017. Any false statement knowingly made in order to execute a firearms purchase demonstrates a concerning disregard for the law and justifies a substantial sentence. To make matters worse, based on the defendant's text message communications with Individual B.B., the defendant knew that Individual B.B. was also a regular controlled substance user. *See* Gov't Exs. 6–7. In fact, the text messages demonstrate that the defendant was, on at least some occasions, a supplier of controlled substances to Individual B.B. *See* Gov't Exs. 6–7. In an interview with law enforcement, Individual B.B. confirmed that the defendant provided him with controlled substances in the past, and regularly offered to do so.

Further, the October 18, 2017 straw purchase was not the only time the defendant lied in order to purchase firearms. In 2018 alone, the defendant made at least three firearms purchases—specifically on April 12, 2018; May 2, 2018; and June 27, 2018—for which he completed an ATF Form 4473. Form 4473 asks the defendant, "Are you an unlawful user of, or addicted to marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance?" Each time, the defendant answered "no." But based on the evidence collected in this case and the defendant's own statements in his post-arrest interview, he was a regular user of various controlled substances during that time period, and these statements were false. Likewise, on May 4, 2016, the defendant purchased another firearm and filled out an ATF Form 4473. There, too, the defendant represented that he was not an unlawful controlled substance user. But, based on the defendant's own statements in his post-arrest interview, he was regularly using LSD at the time.

Because of the inherently dangerous nature of the defendant's crimes, and his willingness to lie to stockpile firearms, the United States submits that a term of imprisonment of eighteen months is necessary to reflect the seriousness of the offense, promote respect for the law, and afford adequate specific and general deterrence.

B. **A Substantial Term of Imprisonment Appropriately Reflects the Defendant's History and Characteristics, Including His Troubling Associations with Violent White Supremacist Organizations, and the Need To Protect the Public.**

The United States must also point out the defendant's associations with a number of violent white supremacist organizations, including Vanguard America and Atomwaffen Division. Specifically, the defendant was associated with Vanguard America in 2017. According to the Anti-Defamation League, "Vanguard America (VA) is a white supremacist group that opposes multiculturalism and believes that America should be an exclusively white nation." "Vanguard America," ADL.ORG, https://www.adl.org/resources/backgrounders/vanguard-america (last visited February 21, 2020). The defendant eventually ceased his association with Vanguard America and became associated with Atomwaffen Division. According to the Anti-Defamation League, Atomwaffen Division "is a small neo-Nazi group whose members are preparing for a race war to combat what they consider the cultural and racial displacement of the white race." "Atomwaffen Division (AWD)," ADL.ORG, https://www.adl.org/resources/backgrounders/-atomwaffen-division-awd (last visited February 21, 2020). During his time associated with Atomwaffen Division in 2018, the defendant served as a Virginia cell leader and recruiter.[7]

While the defendant has a constitutional right to his own viewpoints and associations, these associations, when viewed in light of the defendant's criminal conduct, are alarming. In particular, the defendant's association with Atomwaffen Division is especially troubling because of the group's accelerationist philosophy and well publicized history of violence. Atomwaffen

---

[7] The defendant has never walked away from or repudiated his violent white supremacist ideology. To the extent the defendant might now claim regret for his past associations with white supremacist organizations, that was not the case on the day the defendant was arrested. The defendant informed law enforcement that only one day before he was arrested, he had submitted an application to join Patriot Front. Patriot Front is "a white supremacist group whose members maintain that their ancestors conquered America and bequeathed it to them alone. They define themselves as American fascists or American nationalists who are focused on preserving America's identity as a European-American identity." "Patriot Front," ADL.ORG, https://www.-adl.org/resources/backgrounders/patriot-front (last visited February 21, 2020).

Division "[m]embers train in preparation for an impending race war and promote the use of violence to reach their goal of 'uncompromising victory.'  In a promotional video published on January 21, 2018, members, dressed in military-styled camouflaged fatigues, shout 'gas the k[****]' and 'race war now' as they fire weapons and practice tactical maneuvers." "Atomwaffen Division (AWD)," ADL.ORG, https://www.adl.org/resources/backgrounders/-atomwaffen-division-awd.

A review of the defendant's text messages, uncovered pursuant to a search of the cellular phone of Individual B.B., show the defendant frequently discussing firearms and drugs, and his accelerationist, violent white supremacist ideology.  A few sample text messages will be filed as exhibits to this filing to highlight these discussions.  *See* Gov't Exs. 1–14.

Of particular concern, in a number of text messages, the defendant discussed his own readiness to engage in acts of violence.  For example, on October 24, 2018, the defendant texted two other individuals, "What we need is [Atomwaffen Division] mixed with the ira less o9a. Actual guerrillas that will rollout at a moments notice."[8]  Gov't Ex. 8.  On December 8, 2018, he texted the group, "idk ab you, I take dead n[******] as good news."  Gov't Ex. 9.  On February 18, 2019, the defendant texted another individual, "Im siege pilled[9] af.  Done w this 'movement' nonsense.  We suffer from disunity and structure from the lack of a Führer... we must instead

---

[8] The reference to "o9a" appears to refer to "the Order of Nine Angles," which is "a particular version of Satanism . . . which is steeped in neo-Nazi themes that praise Adolf Hitler, promote Holocaust denial and identify Jews as the enemy."  "Atomwaffen Division (AWD)," ADL.ORG, https://www.adl.org/resources/backgrounders/atomwaffen-division-awd.

[9] The "Siege pill" is "the most extreme pill, and represents the divergence between the 'mainstream' far right—the faction that tries to bring about change within the established political system—and the radical, revolutionary vanguard. . . .  A siegepilled person embraces violent acts of terror to accelerate the impending race war."  "The Extremist Medicine Cabinet: A Guide to Online 'Pills,'" ADL.ORG, https://www.adl.org/blog/the-extremist-medicine-cabinet-a-guide-to-online-pills (last visited February 21, 2020).

become our own Führers." Gov't Ex. 10. In another exchange on April 10, 2019, the defendant proclaimed, "Ive lost all fucks," adding, "Ive been hollering 'fa[****]' 'n[*****]' and all other slurs in pub. Zero fucks given." Gov't Ex. 11. He continued, "Im loud and proud. Not gonna conceal myself anymore. Was in the mall earlier and some dc boons[10] were going full dindu. I just shook my head and said 'fucking n[******]!' Loud as shit. They all stared in complete disbelief." *Id.* He concluded, "let a motherfucker try something... ill go St Roof in an instant." *Id.*; *see also* Gov't Ex. 12. "St. Roof"[11] is an apparent reference to Dylann Roof, who murdered nine individuals during a Bible study at the Emanuel African Methodist Episcopal Church in Charleston, South Carolina on June 17, 2015.[12]

A review of these text messages also shows that the defendant's embrace of a violent white supremacist ideology extended to an embrace of mass murderers as well. On October 27, 2018, Robert Bowers murdered eleven people and wounded six more in a mass shooting at the Tree of Life synagogue in Pittsburgh, Pennsylvania.[13] Upon hearing the news, the defendant responded, "I wish []he sieged it up," referring to the defendant's wish for a higher body count. Gov't Ex.

---

[10] When the defendant was arrested on September 19, 2019, law enforcement asked him about this text message. FBI Special Agent Shawn Matthews asked if, by "dc boons," the defendant was "referring to African Americans." The defendant immediately responded, "A n[*****]? Yes." He added, "A leopard can't change its stripes, or its spots. Science is science." The defendant also explained that "boons" means "baboons."

[11] In an April 28, 2019 text message exchange, the defendant also referred to mass murderers Robert Bowers and Brenton Tarrant as "st bowers" and "st tarrant." Gov't Ex. 13. In his September 19, 2019 interview with law enforcement following his arrest, the defendant admitted that, while Dylann Roof is not "literally a . . . canonized saint," the defendant explained that "what he did, that took balls."

[12] *See* Alan Blinder and Kevin Sack, "Dylann Roof Is Sentenced to Death in Charleston Church Massacre," NEW YORK TIMES (Jan. 10, 2017), https://www.nytimes.com/2017/01/10/us/dylann-roof-trial-charleston.html.

[13] *See* Campbell Robertson, Christopher Mele and Sabrina Tavernise, "11 Killed in Synagogue Massacre; Suspect Charged With 29 Counts," NEW YORK TIMES (OCT. 27, 2018), https://www.-nytimes.com/2018/10/27/us/active-shooter-pittsburgh-synagogue-shooting.html.

14. On March 15, 2019, Brenton Tarrant carried out two consecutive shootings at Christchurch, New Zealand mosques in which 51 individuals were killed and dozens more injured.[14] The next day, the defendant wrote, "[a]s good as tarrant was, hes lukewarm. When international rahowa starts im not stopping at the Bosphorus. I will exterminate the turks entirely. I will hunt them till the end of my days." Gov't Ex. 4. On April 28, 2019, the defendant sent a screenshot of a post by an individual responsible for a synagogue shooting in Poway, California, in which one individual was killed and three others were injured.[15] *See* Gov't Ex. 13. The defendant lamented the low body count, writing "Damnnnn. Coulda been so good." The defendant praised the shooter for the act, adding, "at least he did something. We havent done shit since cville really."[16] *Id.*

    The defendant will no doubt claim that his statements were hyperbolic—just words. But the Court should not look away from the obvious dangers posed by a controlled substance abuser who had regular access to a number of firearms, glorifies acts of violence, and seeks a racial holy war. The danger is especially acute where, as here, the defendant has shown a willingness to use a firearm in an attempt to harm another person. On February 10, 2013, in an attempted drug deal, the defendant pulled a firearm out of his pocket, aimed, and fired a shot at a vehicle driving away from him, when he was in no danger. Today, the defendant glorifies violence and calls for higher body counts in racially motivated mass shootings. The danger could not be more clear.

---

[14] *See* Charlotte Graham-McLay, "Death Toll in New Zealand Mosque Shootings Rises to 51," NEW YORK TIMES (May 2, 2019), https://www.nytimes.com/2019/05/02/world/asia/new-zealand-attack-death-toll.html.

[15] *See* Jill Cowan, "What to Know About the Poway Synagogue Shooting," NEW YORK TIMES (April 29, 2019), https://www.nytimes.com/2019/04/29/us/synagogue-shooting.html.

[16] While he was a member of Vanguard America, the defendant attended the August 2017 "Unite the Right" rally in Charlottesville, Virginia.

The United States submits that the defendant's associations with and participation in violent white supremacist organizations, which engage in and praise racially motivated violence, are important for the court to consider in light of the defendant's criminal conduct and his criminal history, because they suggest an increased risk that the defendant may pose a danger to the community. 18 U.S.C. § 3553(a)(1). Thus, the United States submits that a term of imprisonment of eighteen months and a three-year term of supervised release is necessary to account for the defendant's history and characteristics and the need to protect the public.

## CONCLUSION

For the reasons stated, the United States asks this Court to impose an eighteen-month term of imprisonment, and a three-year term of supervised release.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:        /s/
Anthony W. Mariano
Special Assistant United States Attorney
Ronald L. Walutes, Jr.
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax:   (703) 299-3868
Anthony.Mariano2@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2020, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

_/s/_
Anthony W. Mariano
Special Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax:    (703) 299-3868
Anthony.Mariano2@usdoj.gov
