IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:19CR337 |
| | ) | |
| ANDREW JON THOMASBERG, | ) | The Honorable Liam O'Grady |
| Defendant | ) | |

## EMERGENCY MOTION TO MODIFY SENTENCE

Defendant, Andrew Jon Thomasberg ("Thomasberg") respectfully moves this Court pursuant to the recently amended 18 U.S.C. § 3582(c)(1)(A)(i) for an order modifying his sentence to Home Confinement for the balance of his term of incarceration based upon his susceptibility to infection because of his chronic Lyme Disease.  The current national emergency regarding the COVID-19 virus pandemic.  renders him more vulnerable to infection from COVID-19 if he is compelled to remain incarcerated.  See annexed report from Dr. Richard Goldberg. (Exh. 1)

On February 28, 2020 Thomasberg was sentenced by this Court to be imprisoned for a term of Twelve (12) months and one (1) day with credit for time served, and three years of supervised release.  Thomasberg. is presently housed in quarantine at Cumberland FCI and his scheduled date of release is July 27, 2020.

**The National Emergency**

The United States is in the midst of a pandemic due to COVID-19, with at least 185,000 Americans who have tested positive to date for Coronavirus, while the scope and duration of the pandemic is unknown. https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200331-sitrep-71-covid 19.pdf?sfvrsn=4360e92b_4

On March 13, 2020, the President declared a national emergency, and has since described the pandemic as putting the United States on a "War Time" basis. Addressing the daily growing

number of individuals who are testing positive for the Coronavirus, Federal and State officials, have advised the public regarding efforts at containment of the virus and the available treatment. Unlike any other modern pandemic, there is no medication that is available for treatment of the Coronavirus.  The Coronavirus has rendered all of the protocols of the CDC, NIH, and the BOP for dealing with pandemics in the past non-availing.

Both Federal and state officials have recommended that the only way to flatten the "curve" and reduce the extent of the COVID-19 pandemic, is to create *Social Distancing*, and to otherwise avoid contact with groups. The consequences associated with the Pandemic increase exponentially every day, and have led to businesses and schools being closed, sporting events cancelled, and beaches being closed.  Schools across the Country have been compelled to seek to educate their students on-line, and even Election Primaries have been cancelled. Beginning with the Governor of California on March 19, 2020, more than half of the States have issued Orders to all of its residents to "stay home".  On March 30, 2020, the Governor of Maryland issued a "stay at home" order, which, in part, directed that groups of ten people or more could not congregate. "Social, community, spiritual, religious, recreational, leisure, and sporting gatherings and events ("large gatherings and events") of more than 10 people are hereby prohibited at all locations and venues, including but not limited to parades, festivals, conventions, and fundraisers. b. Planned large gatherings and events must be canceled or postponed until after termination of the state of emergency and the proclamation of the catastrophic health emergency has been rescinded. Clearly, Thomasberg's incarceration among more than a thousand inmates at Cumberland FCI places him in a gathering that would violate the Stay at Home Order.

According to an analysis of fevers and symptoms across the U.S. Data from health technology company Kinsa, which did the analysis using digital thermometers, show that the number of people with flu-like illness – atypical fever and symptoms – began dropping almost immediately after mandatory social distancing measures were implemented in some areas. https://www.usatoday.com/story/news/health/2020/03/25/coronavirus-live-updates-stimulus-deal-done-us-deaths-stocks-trump/2909339001  THE CDC has advised that COVID-19 can spread as follows: **Person-to-person spread-**The virus is thought to spread mainly from person-to-person. Between people who are in close contact with one another (within about 6 feet). Through respiratory droplets produced when an infected person coughs or sneezes. **Spread from**

**contact with contaminated surfaces or objects:** It may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose..

https://www.cdc.gov/coronavirus/2019ncov/prepare/transmission.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019ncov%2Fabout%2Ftransmission.html

In the midst of these dire medical circumstances, the BOP issued a plan on March 13, 2020, "Federal Bureau of Prisons COVID-19 Action Plan", that offered measures paralleling the talking points of the CDC-stressing the importance of maintaining a "cleanly" environment, and *Social Distancing,* to mitigate the transmission of the COVID-19 virus.  Yet, the BOP's response to the crisis falls far short of the cleanliness/*Social Distancing* envisioned by our leaders. Instead, the BOP has sought to address the spread of the Coronavirus by imposing a 30-day suspension for visitation, attorney visits, inmate facility transfers, training of staff, etc.  Though those steps are commendable, they are insufficient to mitigate or prevent the spread of the virus among its 176,000 inmates. The BOP acknowledged this circumstance in its March 13 COVID-19 Action Plan (www.bop.gov/resources/news/20200313_covid-19.jsp), noting "that the population density of prisons creates a risk of infection and transmission for inmates and staff." Those steps have done little to slow the infection of those incarcerated as, according to the BOP, as of March 30, twenty-eight (28) inmates and twenty four (24) staff have tested positive for COVD-19.https://www.bop.gov/coronavirus/

To underscore that walls and barbed wire cannot halt the march of this virus, as there are at least six confirmed cases of Coronavirus within the BOP-three staff-at FCI Berlin in New Hampshire; at FCI Yazoo City, MS; and at the BOP Designation & Sentence Computation Center in Grand Prairie, Texas. Inmates have tested positive for COVID-19 at the Metropolitan Detention Center in Brooklyn, New York; the Metropolitan Correctional Center in New York, New York, and two inmates at FCC Oakdale, LA. As COVID-19 Spreads, Calls Grow to Protect Inmates In Federal Prisons. https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons. On March 16, 2020 a 56-year-old New York City prison investigator died of the coronavirus.  Hand-sanitizers, gloves and masks are scarce for hospitals, and are non-existent in the BOP.  In fact, possession of these items by an inmate would result in disciplinary punishment

3

as they are "contraband." The likelihood of inmates being infected will also occur because Staff come and go each day, and they can be potentially exposed to the virus, and then re-enter the facilities.

On March 30, 2020, the Hon. Mark S. Davis, Chief Judge of the United States District Court for the Eastern District of Virginia issued General Order No 2020-09, which recognized the serious health consequences arising from the pandemic and directed that for ninety (90) days it would seriously jeopardize public health and safety to conduct proceedings in the court. *In re: Court Operations Under the Exigent Circumstances Created by the Outbreak of Coronavirus Disease 2019 (COVID-19),*

http://www.vaed.uscourts.gov/notices/General%20Order%20No.%202020-09.pdf

That same day the House Judiciary Committee Chairman and the Subcommittee on Crime wrote to Attorney General Barr asking that he use his authority under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) to protect the most vulnerable prisoners and those working in federal prisons from coronavirus by releasing "prisoners to home confinement. We ask that both you and the Director of the BOP interpret and exercise this new authority as broadly as possible given that thousands of lives are at stake."  Their letter referenced that on March 26 Barr had "issued a memorandum directing the BOP to prioritize home confinement as an approaporiat4e response to the COVID019 pandemic is 'materially affect[ing]' the functioning' of BOP" but asserting that the memo had not gone far enough to accomplish making the inmates and staff safe enough.

https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2893.; https://nypost.com/2020/03/30/democrats-ask-doj-for-spate-of-federal-prison-releases-due-to-coronavirus/; https://reason.com/2020/03/27/attorney-general-expands-home-confinement-for-some-federal-inmates-facing-coronavirus-threat/.

According to the BOP website, FCI Cumberland, the facility at which Thomasberg is housed, has a total of 1272 inmates, 1027 at the FCI and 245 at the adjoining Camp. The setting for an inmate in prison housing is like a Petri dish, essentially creating a level of vulnerability similar to cruise ships and nursing homes. Indeed, Attorney General Barr echoed that view: "There are particular concerns in this institutional setting. We want to make sure our institutions don't become petri dishes and it doesn't spread rapidly through an institution…" Cumberland is

in "lockdown" and the inmates are being held in their housing units. The rating (distance between inmates' beds) is approximately 1½ feet.  Under those conditions, there can be no *Social Distancing*. There is also a heightened risk of the virus spreading because of the close proximity of people, frequent foot traffic in BOP facilities, and the inevitability of the spread of the virus within the BOP is a certainty.  As reported in the Washington Post on March 17, Josiah D. Rich, a physician and professor of medicine and epidemiology at Brown University in discussing the problems associated with the spread of the virus in prison noted: "[Y]ou have an artificial environment which is at a high risk for transmission…the same you have in military barracks and dormitories."  The Post also reported that Joe Rojas, southeast regional vice president for the Council of Prison Locals advised that officers are not being provided with basic protective gear and supplies. Most are bringing in their own alcohol wipes and hand sanitizer-if they are able to buy the products. Masks, he said, are also in short supply.
https://www.washingtonpost.com/national/jails-and-prisons-suspend-visitation-to-keep-coronavirus-from-spreading/2020/03/16/0cae4adc-6789-11ea-abef-020f086a3fab_story.html

CBS has also reported on the federal prison system and the impact of the Coronavirus: "At the Tallahassee Federal Correctional Institution, prison employees told CBS News that officers charged with moving prisoners do not have access to protective gear. Employees said the facility has 60 masks to be shared among 200 employees, no soap in multiple staff restrooms, a lack of hand sanitizer and a supply of gloves that may only last through next week."
https://w.w.w.cbsnews/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19.

It is hardly surprising from this reporting, and the wealth of experience the courts have regarding the BOP's Health Services, that there will insufficient staff and health services that can be provided to those at FCI Cumberland to address any outbreak of the virus among the staff and/or inmates. It is inarguable that the living conditions for inmates in the federal prison system, and, in particular, in a dorm setting, are not sanitary, and represent the opposite extreme of the recommended social setting by our leaders to not aggregate in any facility with more than 25 people to avoid the spread of COVID-19.  There can be no *Social Distancing* at FCI Cumberland.  Because FCI Cumberland is ill-equipped for the pandemic, the reality is that there

5

is little that can be done to avoid the spread of the virus.  Inmates' clothing will be gathered in carts and placed in large washing machines to be washed and dried together. The bathrooms are communal, and there is no place to isolate oneself from other inmates. The first reports of infected BOP personnel coincided with the announcement of the BOP Action Plan of March 13, 2020**,** and it is clear that the Action Plan cannot be implemented in such a way to prevent sick staff from working.  Either way, the risks are obviously real both on a macro and micro level.  As Forbes Magazine reported on March 21, "Can US Prisons React Fast Enough To COVID-19" other countries have cut their prison population but noted that "The Federal Bureau of Prisons has suspended social visits, legal visits and transportation of inmates between institutions.  There are more than 175,000 people incarcerated and among them are 10,000 that are over the age of 60 and thousands more in federal medical centers that treated advance diseases.  There are also those with high risk health profiles that make them more likely to become seriously ill from the virus. https://www.forbes.com/sites/walterpavlo/2020/03/21/us-prisons-can-they-react-fast-enough-to-covid-19/#699d940c1033   BOP has not created an emergency administrative remedy for prisoners at serious risk from COVID-19.  Seeking such administrative relief is futile. See Fletcher v. Menard Correctional Center, 623 F.3d 1171, 1174 (7th Cir. 2010) ("If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust.")

The release of prisoners because of COVID-19 has occurred both in the United States and abroad.  The New York Times has reported that "[I]n other countries where the pandemic is more widespread, both prisoners and guards have fallen sick. The coronavirus swept through Chinese prisons in late February, with reports of more than 500 cases spreading across at least four facilities in three provinces. And Iran temporarily freed about 70,000 prisoners earlier this month to help curb the epidemic there." https://www.nytimes.com/2020/03/17/us/coronavirus-prisons.html.

 The Trump administration has indicated it is considering the release of some federal prisoners in an attempt to reduce the risk of a larger outbreak of the coronavirus in the nation's

largest prison system. https://www.usatoday.com/story/news/politics/2020/03/22/first-federal-inmate-tests-positive-coronavirus-new-york/2893959001/

Members of the Congress have also initiated legislation and communication with the Department of Justice to seek release of inmates. "Sen. Kamala Harris, D-Calif., called for "low-risk" inmates in California federal prisons to be released from custody, according to a letter sent to Federal Bureau of Prisons (BOP) Director Michael Carvajal on Thursday. Her decision comes after two prisoners in the state are in quarantine after coming in contact with a person who tested positive for coronavirus.' In the midst of this crisis, BOP should be taking reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus,' Harris said. https://thehill.com/homenews/senate/488515-harris-pushes-for-release-of-low-risk-federal-prisoners-amid-coronavirus.   "Across the United States, local and state officials have begun freeing low-level and nonviolent offenders — among them, migrants, the elderly, the infirm and those with short remaining sentences — to avoid an outbreak that the American Civil Liberties Union warned would spread "quickly and devastatingly." https://www.nbcnews.com/politics/politics-news/coronavirus-behind-bars-prisoners-being-freed-slow-spread-virus-vectors-n116988

On March 25, 2020 Sen. Cory Booker (D-N.J.) introduced a bill that would allow tens of thousands of people currently in federal prisons and jails to be released during the pandemic. "His measure attempts to address the needs of a community that has been particularly vulnerable to the virus: the millions of people behind bars. An inmate at the Metropolitan Detention Center in Brooklyn, a federal jail in New York, has already tested positive for the disease, and criminal justice advocates have warned that jails and prisons are the perfect incubators for an outbreak. … "We have an obligation to do everything we can to prevent the spread of this deadly disease," Booker said in a statement. "That means moving certain incarcerated people to community supervision when they don't pose a violent threat to our communities and are facing high risk of serious illness or death from COVID-19." As of March 24, 2020 more than 50,000 people have tested positive for the new coronavirus in the US, with deaths surpassing 700. Both numbers are expected to rise as testing becomes more widespread after serious delays. The Centers for

Disease Control and Prevention has been <u>recommending</u> both hand washing and social distancing for weeks, but for incarcerated individuals, those recommendations are unrealistic.

*For thousands of people behind bars, contracting COVID-19 is tantamount to a death sentence,* Booker said. *Those in prison and jail tend to have much higher rates of underlying* health i*ssues than the general public, and the conditions of confinement make social distancing virtually impossible.* Prison and jail facilities are notoriously unhygienic, with little access to soap and water. Hand-sanitizer, which can also kill the virus, is contraband because its high alcohol content makes it a potential for abuse. Inmates living in close quarters are the perfect vectors for disease. The bill calls for the US Bureau of Prisons and the US Marshals Service to immediately place incarcerated people who don't pose a threat to public safety on community supervision. https://www.motherjones.com/coronavirus-updates/2020/03/cory-booker-just-demanded-the-release-of-vulnerable-federal-inmates/

In a related move, on March 23, 2020, New Jersey announced that it  will release as many as 1,000 people from its jails in what is believed to be the nation's broadest effort to address the risks of the highly contagious coronavirus spreading among the incarcerated. New Jersey's chief justice, Stuart Rabner, signed an order late Sunday authorizing the release of inmates serving certain types of sentences in county jails as the number of coronavirus cases in detention centers nationwide continues to mount… No other state is thought to have taken such sweeping action to reduce its jail population in response to the coronavirus, but other cities, including New York, Cleveland and Tulsa, Okla., have moved to release sick or vulnerable detainees. https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html Roughly two hundred fifty (250) inmates in the Norfolk jail have been released because of the coronavirus. https://www.pilotonline.com/news/crime/vp-nw-coronavirus-jail-inmates-released-20200329-ba2hcadexzabdfw3vukvaaipxe-story.html

It is in keeping with those recommendations by the President, Federal Health officials and State governments, that Thomasberg requests the intervention of this Court, as continuing to require him to be in a prison facility will result in an unnecessary risk of his exposure to COVID-19 with such a brief period of time remaining in his sentence.

A consulting physician, Dr. Richard Goldberg, has confirmed that Thomasberg suffers from Chronic Lyme Disease that will make him more susceptible to the Coronavirus.

8

Dr. Goldberg reported that:

Chronic Lyme Disease, or Post-treatment Lyme disease, is considered a syndrome that can occur when a person who is treated with antibiotic therapy for the disease continues to experience symptoms. According to an article in the New England Journal of Medicine, "10 to 20% of treated patients may have lingering symptoms of fatigue, musculoskeletal pains, disrupted sleep, and lack of customary mental functions." https://www.nejm.org/doi/10.1056/NEJMe1502350. These symptoms may last 6 months or for a longer duration.

According to the evaluation done by Dr. Jemsek, his examination of Mr. Thomasberg revealed the following: Lyme WB IgM: (+) 41, 34, 23, positive; IgG: 93/83, 66, 41, 39, 28, 23, 18, positive; Bartonella henselae IgG/IgM: negative; Babesia microti IgM/IgG: negative; Erlichia Ab panel IgM/IgG: negative; RMSF IgG EIA: equivocal; IgG IFA: 1:64, high, positive; Anaplasma Phagocytophilum IgG/IgM: negative; Lyme Immunoblot IgG (+): 93, 66, 41, 39, 30, 28, 23, 18; Immunoblot IgM (+): 41, 34, 23. These tests show a positive exposure to both Borrelia and Rocky Mountain Spotted fever—both documented in his PSR.

In addition to the positive serology testing, Dr. Jemsek discusses report positive symptomatology consistent with Chronic Lyme disease including: disordered sleep with insomnia, restlessness, sweats; constitutional symptoms of chills with day/night sweats; cognitive dysfunction with poor concentration and focus; disorder of mood with anxiety, depression, PTSD; limbic irritability with appetite fluctuation, photo sensitivity; Dysautonomia with postural orthostasis; musculoskeletal complaints with arthralgias in the back and knees, and myalgias of several muscle groups; mononeutitis multiplex with twitching and radicular pain with associated fasciculations and motor weakness, a fatigue state with exhaustion; visual changes especially with light transmission; and chronic headaches. As previously stated, these are frequently seen in patients with Chronic Lyme disease.

"The Borrelia bacteria (cause of Lyme disease) transforms from an acute to a chronic infection by transforming the body to a TH2 "extracellular" dominant response and then converting from a free swimming spirochete form in the blood into an intracellular form (L-form) to escape the elevated TH2 immunity. The suppressed and down-regulated TH1 intracellular immune response becomes an ineffective immune response by the body and an effective evasion strategy, which is the hallmark of transformation to late-stage Lyme dissemination. "https://www.ldnresearchtrust.org/immune-dysfunction-and-chronic-lyme-disease

The essence of the chronic disease state is that formation of an underlying immune dysfunction that can limit the body's ability to fight infection.

Currently the world is facing a pandemic due to COVID-19—a coronavirus, and our

immediate concern is for the safety of Mr. Thomasberg, an individual with a known immune deficiency disorder (chronic lyme disease) at a BOP facility during this pandemic. We are all experiencing, especially in America, a slow administrative response to the virus despite our increasing knowledge regarding the infection. The virus appears to be highly contagious, although at present, due to the lack of testing, we are unaware as to the extent of the disease at his facility. Those at increased risk are exemplified by Mr. Thomasberg, who is living with Post-treatment lyme syndrome, as well as our elderly and other immuno-compromised segments of society. As we now know, those individuals like Mr. Thomasberg are at increased risk should they be infected by the virus. Pneumonia caused by the virus, and the destruction of the pulmonary tree it causes, are the usual cause of death.

Our major fear for Mr. Thomasberg is that lyme disease patients and others with compromised immune systems are more prone to infections like COVID-19. https://www.lymedisease.org/lyme-response-to-coronavirus/ These will be extremely difficult times for the Bureau of Prisons.

We feel the medically and legally prudent course of action would be to send Mr. Thomasberg to house arrest for the remainder of his sentence (with or without a reduction to time served). There is no reason to keep him (at risk) at a Federal facility. These are especially dangerous times for many in our society, and the Bureau of Prisons is the caretaker of far too many.

See attached Exhibit 1.

**Jurisdiction**

On December 21, 2018, the President signed the First Step Act into law. Among the criminal justice reforms, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a defendant's motion for reduction of sentence.

Pursuant to the First Step Act, the Court has jurisdiction to determine whether "extraordinary and compelling reasons" warrant a sentence reduction after consideration of sentencing factors under 18 U.S.C. § 3553(a) and the Sentencing Commission's policy statement on reduction of sentence in U.S.S.G. § 1B1.13.

**Sentence Reduction Authority Under 18 U.S.C. § 3582(c)(1)(A)(i)**

This Court has discretion to reduce the term of imprisonment imposed in this case based on § 3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce a term of imprisonment, after consideration of the factors set forth in section 3553(a) to the extent they are

applicable, if it finds that extraordinary and compelling reasons warrant such a reduction[.]" Pursuant to the requirement of 28 U.S.C. § 944(t), as authorized by 28 U.S.C. § 944(a)(2)(C), the Sentencing Commission promulgated a policy statement that sets out the criteria and examples of "extraordinary and compelling reasons" in U.S.S.G. § 1B1.13 that includes Thomasberg's medical condition when considered in light of the pandemic and associated national emergency declared on March 13, 2020, and the unique risks to Thomasberg, the legal and humane remedy is for Thomasberg  to be allowed to complete his sentence in Home Confinement instead of exposing him to an increased likelihood of exposure to the Coronavirus.

Ordinarily, an application pursuant to §3582 must be initially submitted to the BOP, a process that involves making an application to the warden who oversees the institution that houses the inmate applicant. The warden is permitted 30-days to review and reply to the application. Experience tells us that most wardens reply and typically deny the application.[1] The administrative process requires the inmate to then exhaust all administrative remedies before making an application to a court for a judicial resolution of the application. Exhausting administrative remedies takes approximately six to nine months. Thomasberg's sentence would have ended by the time the administrative process was complete. §3582 offers a path when exhausting one's administrative remedies is an impossibility the inmate applicant can motion his or her sentencing court for the relief sought. As Covid-19 could be within Cumberland FCI within days if not sooner, the national emergency places Thomasberg's very existence in the hands of the court.

As Judge Trenga concluded in granting a 3582 (c)(1)(A) motion *in United States v. Redd*, Case No. 1:97-cr-00006-AJT (E.D. Va. Mar. 16, 2020):

---

[1] *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (noting that until 2013, "only 24 inmates were released [on average] each year" under § 3582 on motion of the BOP, and between August 2013 and September 2014, that number increased to 83). *United States v. Redd*, Case No. 1:97-cr-00006-AJT, 13 n.13 (E.D. Va. Mar. 16, 2020)

The First Step Act was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants. And while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the *exclusive* channel through which a sentence reduction could be considered by courts. Indeed, the First Step Act authorized courts to act independently of the BOP Director, upon a defendant's motion, once administrative remedies are exhausted, reflecting the First Step Act's legislative purpose and intent to expand the opportunity for a defendant to seek review (and potentially a reduction) of his or her sentence. In that regard, the First Step Act effectively amended U.S.S.G. § 1B1.13 by eliminating the requirement that a sentence reduction under § 3582(c)(1)(A) be "upon motion of the Director of Bureau of Prisons," as U.S.S.G. § 1B1.13 requires. For this reason, any assessment of whether a court acted "consistent" with U.S.S.G. § 1B1.13 based on reasons other than those specifically mentioned in Application Notes 1(A)-(C) must consider the First Step Act's effect on that policy statement, and Application Note 1(D) in particular. *See also* 18 U.S.C. § 3553(a)(5) (any "pertinent policy statement" is to be considered "subject to any amendments made to such policy  statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into the amendments issued under section 994(p) of title 28."); *Mistretta v. United States*, 488 U.S. 361, 394 (1989) (Congress may "revoke or amend" any of the Commission's policy statements by statute at any time); *Stinson v. United States*, 508 U.S. 36, 38 (1993) ("We decide that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.")".

See also, *United States v. O'Bryan, No. 96-10076-03-JTM (D. Kan. Feb. 21, 2020);* United States v. Mondaca, Case No.: 89-CR-0655 DMS (S.D. Cal. Mar. 3, 2020); United States v. Young, No. 2:00-cr-00002-1 (M.D. Tenn. Mar. 4, 2020); *United States v. Davis*, No. PJM 00-424-2, 2020 WL 1083158 (D. Md. March 5, 2020); *United States v. Perez*, No. No. 88-10094-1-JTM, 2020 WL 1180719 (D. Kansas March 11, 2020)

Thomasberg meets the threshold requirement of "extraordinary and compelling reasons" because he is suffering from a medical condition that potentially compromises his immune

system and makes him susceptible to COVID-19. This substantially diminishes his ability "to provide self-care within the environment of a correctional facility". U.S.S.G. § 1B1.13, Application Note.1(A)(ii).  Because Thomasberg's circumstances fall within the Sentencing Commission's standards for reduction of sentence based on his vulnerable medical condition as defined in Application Note 1 of U.S.S.G. § 1B1.13, Thomasberg respectfully requests that the Court grant the requested sentence and order that he be released to serve the balance of his sentence in Home Confinement.

Allowing Thomasberg to serve his sentence under the continued supervision of the Bureau of Prisons at home is a modest request, legally supported, and has significant long term personal and public health positive impact.

The Court can also consider 18 U.S.C. § 3553(a)(2)(D), which provides that the Court shall consider the need for the sentence to "provide the defendant with needed educational or vocational training, medical care [emphasis added], or other correctional treatment in the most effective manner".  Obviously, the national emergency due to the COVID-19 pandemic was not known at the time of sentencing, but in light of it, and Thomasberg's current and known risk, he urges the Court's allowance of the relief sought.

At least two courts have released inmates from BOP facilities as a result of their pre-existing medical conditions, the impact of the COVID-19 pandemic, and the danger of being incarcerated in a BOP facility.  In *United States v. Huneeus*, Case No: 1:19-cr-10117 (D. Mass), a case involving a similar sentence and time remaining, Judge Talwani issued an Order on March 17, 2020 modifying Huneeus' sentence by ordering his immediate release to Home Confinement. In *United States v. Stephens,* Case 1:15-crt-00095-AJN, DKt. No 27981, (SDNY) 3/19/20, the district court ordered the release of Stephens from the MCC to remain at his home. Although *Huneeus* was already serving his sentence at the time of his release to Home Confinement, and *Stephens* involved a bail application, the basis for granting relief was predicated upon their pre-existing health conditions and the potential for exposure in the BOP.

Thomasberg does not pose a danger or risk to the community. Continuing Thomasberg's sentence within the custodial environment of a federal prison no longer serves any penal,

13

deterrence of other reason as contrasted to the risk that holding him in BOP facility could inflict a cruel and unnecessary level of harm on him due to COVID-19.[2]

**Conclusion**

For the foregoing reasons, Thomasberg respectfully requests that the Court allow a modification of his sentence and allow him to serve the balance of his prison sentence a matter of four months in Home Confinement under the supervision of the BOP.

Thomasberg respectfully requests an emergency hearing, but recognizing the difficulties in arranging for his attendance, or even video-conferencing, Thomasberg hereby waives his appearance for re-sentencing.

Respectfully submitted,

ANDREW THOMASBERG

By:＿＿/s/＿＿＿＿＿＿＿

Gretchen Lynch Taylor
Virginia Bar #39087
Attorney for Andrew Jon Thomasberg
Taylor Law Company
10605 Judicial Drive, Suite A-5
Fairfax, Virginia 22030
Phone: 703-385-5529
Fax: 703-934-1004
gretchen@taylorlawco.com

---

[2]

The current pandemic cannot be contrasted with that of 2012.  The 2012 "preparedness" was for a strain of Influenza for which there were two known anti-viral treatments and available supplies of the two.  According to that 2012 BOP Module 2 those "**Antivirals can be used in three ways: Treatment:** To treat flu cases (ideally should be started within 48 hours of symptom-onset). **Post-exposure prophylaxis:** To prevent the flu after exposure to someone sick with flu. **Prophylaxis:** To prevent the flu during an ongoing outbreak.  In 2012 there were
"Two brands of antivirals are effective for treating influenza:  oseltamivir (Tamiflu®) and zanamivir (Relenza®).  BOP is stockpiling both drugs."   Of course, it is elemental that the government and others are still attempting to discover what COVID-19 is, and for which no antivirals are available, with government estimates that it will take a year to 18 months to develop same.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of April, 2020, I will file the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/ s /
_____

Gretchen Lynch Taylor
Virginia Bar #39087
Attorney for Andrew Jon Thomasberg
Taylor Law Company
10605 Judicial Drive, Suite A-5
Fairfax, Virginia 22030
Phone: 703-385-5529
Fax: 703-934-1004
gretchen@taylorlawco.com