UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**UNITED STATES OF AMERICA,**          )
                                       ) Criminal Action
          **Plaintiff,**               ) No. 1:19-CR-337
                                       )
          **v.**                       ) February 28, 2020
                                       ) 10:04 a.m.
**ANDREW JON THOMASBERG,**             )
                                       )
          **Defendant.**               )
                                       )

*TRANSCRIPT OF SENTENCING PROCEEDINGS*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the United          **Anthony Mariano, Assistant U.S.**
States:                 **Attorney**
                        US Attorney's Office (Alexandria-NA)
                        2100 Jamieson Avenue
                        Alexandria, VA 22314
                        703-299-3700
                        Email: Anthony.Mariano2@usdoj.gov

                        **Ronald L. Walutes, Jr., Assistant**
                        **U.S. Attorney**
                        United States Attorney's Office
                        2100 Jamieson Ave
                        Alexandria, VA 22314
                        (703)299-3700
                        Email: Ron.walutes@usdoj.gov

For the Defendant:      **Gretchen Lynch Taylor, Esq.**
                        Taylor Law Company
                        10605 Judicial Drive
                        Suite A-5
                        Fairfax, VA 22030
                        (703) 385-5529
                        Fax: (703) 934-1004
                        Email: Gretchen@taylorlawco.com

APPEARANCES:  Cont.


Court Reporter:                **Scott L. Wallace, RDR, RMR, CRR**
                              Official Court Reporter
                              United States District Court
                              401 Courthouse Square
                              Alexandria, VA  2231-5798
                              703.549.4626
                              Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1      **<u>MORNING SESSION, FEBRUARY 28, 2020</u>**

2   (10:04 a.m.)

3       THE DEPUTY CLERK:  The Court calls case 1:19-CR-337,

4   *United States of America versus Andrew Jon Thomasberg* for

5   sentencing.  May I have the appearances, please, first for the

6   government.

7       MR. MARIANO:  Good morning, Your Honor.  Anthony Mariano

8   and Ronald Walutes for the United States.

9       THE COURT:  All right.  Good morning to you both.

10      MS. TAYLOR:  Good morning, Your Honor, Gretchen Taylor on

11  behalf of the defendant.

12      THE COURT:  All right.  Good morning, Ms. Taylor.

13      MS. TAYLOR:  I just have to have my client sign something

14  real quick, Your Honor.

15      THE COURT:  Certainly.  Take whatever time you need.

16      (Brief pause in proceedings.)

17      THE COURT:  All right.  This comes on for sentencing.  Are

18  you ready to proceed?

19      MR. MARIANO:  Yes, Your Honor.

20      MS. TAYLOR:  Yes, Your Honor.

21      THE COURT:  All right.  Does the government have any

22  objections to the Guideline calculations or the contents of the

23  presentence report?

24      MR. MARIANO:  We do not, Your Honor.

25      THE COURT:  All right.  Ms. Taylor, do you have an

1   objection to the --

2        MS. TAYLOR:  We do have an objection to the Guidelines,

3   Your Honor.  As far as our other objections that don't affect the

4   Guidelines, we don't need to discuss those today.  I don't think

5   any of them are essential to the disposition of the case today,

6   but we are still asking the Court to consider granting a

7   reduction in the Guidelines due to my client possessing all

8   ammunition and firearms solely for lawful sporting purposes or

9   collection, which is -- it's a big difference in the Guidelines,

10  and I can proceed however the Court wants.  I can either proffer

11  my client's testimony or I can call him to the stand.

12       THE COURT:  You can go ahead and proffer it.  That's fine.

13       MS. TAYLOR:  Yes, Your Honor.  My client would testify, if

14  called, that he did, in fact, possess all of his firearms and

15  ammunition for lawful sporting purposes or collections.  He has

16  had a keen interest in firearms since, I would say, probably the

17  age of nine or ten.  He's always been around them.  He had been

18  taken to the range with his dad and his granddad for many, many

19  years.  That is why he basically had them.  And then he started

20  developing an interest in the history of the firearms and started

21  collecting them once he was able to legally purchase them

22  himself, and then he had some that were, you know, purchased by

23  family members, but he had six firearms in his bedroom, and he

24  had one firearm which actually belonged to his father which was

25  recovered from his car.  It was secured in a glove box which does

1    not make it a violation of Virginia law for carrying a concealed

2    weapon.  He would testify that he had never -- he has never

3    brandished, discharged, or carried unlawfully any of those

4    firearms.

5         The government will say that some of my client's friends

6    have said that he will carry them about his person.  He would

7    testify only on private property with permission, and he did not

8    feel that that was a violation of Virginia law.  It was just in

9    transport to a range or to something of that nature, but that he

10   was keeping these firearms because of his interest in firearms.

11        He's worked as a gunsmith, and he was not keeping them to

12   prepare for a racial holy war, as the government has suggested.

13   They have given you 60-some pages of text messages.  These are

14   private chat messages between him and his friends.  These are not

15   propaganda put on the Internet.  And although the government

16   claims that he suggested that he was amassing this -- these

17   weapons for a racial holy war.  Actually, he never said that.  He

18   believed that there was, when he wrote these almost two years

19   ago, that there was some racial holy war coming in the future.

20   That's what he's telling his friends, but he doesn't say anything

21   in there directly about amassing an arsenal for such.  He wasn't.

22   He has guns because he's always had guns, and that's what they're

23   for.

24        I also made the point in my brief that his very similar

25   codefendant who's also on all these same text messages, was given

1    the reduction pursuant to an agreement by the government.  He

2    actually had in his possession, according to the Statement of

3    Facts, four firearms, and one of them is the same firearm that

4    was the subject of the straw purchase that my client pled guilty

5    to.  So, he is part of that same transaction, and the actual gun

6    was in Brian Baynes' possession, who was given the enhanced --

7    was given the reduction.  Brian Baynes also had a ton of

8    ammunition in his possession.  I think I counted it up and it was

9    over 1300 rounds, lots of ammunition and magazines.  There's just

10   no real difference between the two, and Brian Baynes was given

11   the reduction, and I think that's a factor that the Court could

12   also consider.

13        THE COURT:  All right.  Thank you, Ms. Taylor.  Who owned

14   the gun locker in the basement?

15        MS. TAYLOR:  Oh, that's his grandfather's, who's now

16   deceased, Your Honor, and his grandmother is here, and she would

17   testify that he was a military war veteran.  He had a collection

18   of mostly old rifles, and they were locked up in the basement.

19   Those were all his grandfather's rifles.

20        THE COURT:  Okay.  Thank you.  Mr. Mariano.

21        MR. MARIANO:  Thank you, Your Honor.  The defense didn't

22   talk about one criminal -- one very important point, and that's

23   the defendant's criminal history.  And I know the defense wants

24   to focus on the four firearms that are in the Statement of Facts,

25   but the Guidelines suggest otherwise.  The Guidelines direct the

1    Court, among other factors, to consider whether the defendant has

2    a criminal history that involves firearms, and, in fact, he does.

3    And that's one of the -- among a number of factors that

4    distinguishes this case from that of Brian Baynes.

5         Additionally, Your Honor, this is a defendant who straw-

6    purchased a firearm that wasn't for a collection purpose; it was

7    a purchase that he made to give to another individual that he

8    knew was a controlled substance user.  I have to reject the

9    characterization of the text messages.  They were private text

10   messages, but what they show is his purpose.  And when the

11   defendant who has amassed so many weapons is saying things like,

12   "Get your gear ready because RAHOWA is coming," I think it's very

13   obvious what he means by that when he's collecting all these

14   firearms, when he's keeping them next to his bed, in his desk

15   drawer, in his car, a loaded gun in his car?  I don't think

16   individuals are keeping a loaded gun in their car for purposes of

17   collection.  So I think all of those factors counsel very

18   strongly against the reduction.

19        THE COURT:  All right.  Thank you.

20        MS. TAYLOR:  If I could just respond very briefly to the

21   criminal history argument, Your Honor.  It was an assault

22   conviction, not a gun conviction, when my client was 14 years

23   old.  And as the Court, I'm sure, is aware, because it was in the

24   presentence report, the circumstances surrounding that is that

25   prior to him discharging a firearm there was -- he was dragged by

1    a car.  He was run over by the car, in fact, and had hashmarks on

2    his arm he showed to the police because he had been dragged.  One

3    part says 65 feet, another part says a hundred feet, whatever, a

4    long way, and in kind of reaction to stop the car, he shot at the

5    car.  He didn't hit the car, he didn't hit any people, and he was

6    not convicted of a gun offense.  And, again, this was when he was

7    14 in Juvenile Court.  Thank you, Your Honor.

8         THE COURT:  I understand.  In looking at the 2K2.1(b)(2)

9    reduction, very prominently is the word "solely for lawful

10   supporting purposes or collection," and when you go to note 6, it

11   points the Court to the number and type of firearms, the amount

12   and type of ammunition, the location and the circumstances of the

13   weapons, the prior convictions for firearm-related offenses; all

14   those facts weigh against giving the reduction, the firearms next

15   to the bed, the one in the car is significant, magazines strewn

16   throughout the car, the 47 other magazines strewn around his

17   bedroom and home, the prior conviction -- and I understand the

18   circumstances of that, but they certainly are evidence that these

19   weapons are not for collection or sporting purposes but for

20   defense, if necessary, and for protection.

21        In any event, they're not for collection and sporting

22   purposes, and I agree with Mr. Mariano that the text messages are

23   evidence that the purpose of these guns went far beyond sporting

24   purposes or collection and instead also were being collected for

25   any war that would take place, even -- and I understand that

1    there's a belief that Mr. Thomasberg was puffing or he was just

2    going along with the theme of the chats when he made several of

3    these unfortunate statements, but they certainly are evidence

4    that the guns were there for more than the purpose -- and when

5    you're looking at the restriction of the word -- using the word

6    "solely," I don't find that the 2K2.1(b)(2) reduction is proper.

7    So, your exception is noted, but I'm not going to give that.

8            Mr. Thomasberg, did you read the presentence report, sir?

9            THE DEFENDANT:  I have, Your Honor.

10           THE COURT:  And any other corrections, additions, that you

11   want made to the report at this time?

12           THE DEFENDANT:  No, Your Honor.

13           THE COURT:  All right.  Have a seat.  Thank you.

14           I'll order the report filed without amendment.  The

15   Guideline range is properly calculated at a level 13 after

16   Mr. Thomasberg has received 3 points for acceptance of

17   responsibility and results in a Guideline range of 12 to 18

18   months and one to three years of supervised release.  And I read

19   the parties' submissions.

20           Mr. Mariano, I'll hear anything else that you want to say

21   at this time.

22           MR. MARIANO:  Yes, Your Honor.  We've recommended a term

23   of imprisonment of 18 months, and we think that's appropriate for

24   a number of reasons, and first I'll address the seriousness of

25   these offenses.  Any ordinary 922(g)(3) offense is very serious

1    because, as the Fourth Circuit has recognized, the combination of

2    drugs and firearms can be dangerous, and even deadly, but here

3    the defendant's conduct was even worse.

4         This is an individual who has a long history of drug-

5    related problems and was combining multiple drugs with multiple

6    firearms, and he wasn't just possessing those firearms; he was

7    buying and selling firearms.  He has admitted to regularly

8    carrying firearms in his post-arrest interview, so we think that

9    makes it even more serious than the typical case, and it's the

10   same situation with the 922(a)(6).  That is always a serious

11   offense because it conceals critical information from law

12   enforcement, and it makes it harder for them to prevent violent

13   crime and harder to investigate violent crime when it occurs.

14   But here the defendant's conduct was even more aggravating

15   because he provided the firearm that he straw purchased to an

16   individual that he knew was prohibited because that person was a

17   controlled substance user.

18        In fact, the defendant had provided controlled substances

19   to the person that he provided the gun to.  And while the counts

20   are grouped for Guidelines purposes, I think the Court should

21   seriously consider that there are multiple separate offenses

22   here, and that shows a repeated disregard for an unwillingness to

23   follow the law, and that's particularly troubling because the

24   defendant did work at a gun store, so he would know more than

25   most defendants what the laws and the regulations were, and he

1    chose to disregard them.

2         Finally, I would ask the Court to look at the statements

3    that the defendant provided in their position paper, because I

4    think what he does is he admits his guilt; but I think

5    troublingly he doesn't really acknowledge the wrongfulness of his

6    conduct, and I think that's important to consider because it

7    speaks to a risk of recidivism.

8         Additionally, Your Honor, I want to mention the

9    defendant's history and characteristics, because I think that's

10   one of the factors that makes this conduct so troubling and

11   alarming.  And I know that when we talk about the defendant's

12   words the defense says that we don't punish people in this

13   country for having hate in their hearts, and that's right, and

14   we're not asking the Court to do this because it's not just the

15   associations and it's not that the words reflect hate, it's that

16   the words promote and glorify racially motivated violence, and

17   everyone in the community understands how dangerous that can be.

18        So, we are asking the Court to consider those words.  What

19   he says is, "Could have been so good; at least he did something."

20   That was after a synagogue shooting in California in April 2014

21   when one person was murdered.

22        "I wish he seized shit up."  Those were the words of the

23   defendant after an October 2018 mass shooting in which 11 people

24   were murdered.

25        Saint Roof, Saint Terrence, Saint Bowers, these are the

1    honorifics bestowed by the defendant on mass murderers.  These

2    are the people, apparently, that he looked up to.  And these

3    weren't, as the defense has tried to suggest, just words.

4         On February 10th, 2013 the defendant went beyond words

5    when he went to an attempted drug deal, brought a firearm with

6    him, and when the individuals took the drugs that he was selling

7    and left without paying, the defense was right, he was knocked to

8    the ground, he had been dragged, but then as the car was speeding

9    away he stood up, reached into his pocket, pulled out a firearm,

10   held it with both hands, aimed and fired a shot at the vehicle,

11   those driving away from him when he was in no real danger.

12        So, this isn't just the defendant that talks about and

13   glorifies violence; this is a defendant who has shown a

14   willingness to engage in acts of violence himself.

15        So, as I've been thinking about this sentencing, I think

16   about the adage, "When someone shows you who they are, believe

17   them the first time."  And this defendant has shown the Court

18   through his criminal conduct and his criminal history who he is,

19   and this defendant has told the Court in his own words who he is.

20   All we're asking is that the Court believe him.  Believe him when

21   he shows a willingness to engage in an act of violence with a

22   firearm; believe him when he says, quote, "I'll go Saint Roof in

23   an instant," talking about mass murderer or Dylann Roof, because

24   the sentence the Court imposes has to protect the public, and I

25   would submit that the risk is too high for the Court not to take

1   the defendant at his word and at his actions.

2        So we've recommended 18 months, but I would just add that

3   the Court, of course, has the discretion to go above the

4   Guidelines, and that might be appropriate, whereas here I would

5   submit that the criminal history understates the defendant's

6   record, particularly as it relates to the instant offense because

7   they were both involving firearms and drugs.

8        Finally, we've also recommended the maximum term of

9   supervised release, three years.  We think that's appropriate to

10  make sure that the defendant doesn't possess controlled

11  substances or firearms again.  And I would specifically request,

12  as a special condition, that not only he not possess firearms or

13  ammunition, but that he also not possess any magazines or any gun

14  parts or components.  Thank you, Your Honor.

15       THE COURT:  All right.  Thank you.  All right, Ms. Taylor.

16       MS. TAYLOR:  First, Your Honor, I would like to point out

17  the defendant's family that's here in court supporting him.  He's

18  got a large and very supportive family.  His mother is here, his

19  father's here, his stepfather is here, both of his grandmothers

20  are here, two sisters are here, a brother-in-law, two uncles, two

21  aunts, and his therapist, Dr. Greelis, in the first row.

22       THE COURT:  Good morning to all of you.  Thank you for the

23  letters that you wrote in support of Mr. Thomasberg.  Thank you.

24       MS. TAYLOR:  Obviously, very extensive letters submitted

25  by the family, as well as the letters from Dr. Greelis, to try to

1    give the Court a fuller picture of Andrew Thomasberg.  Why is

2    Andrew Thomasberg here?  He was chosen to be prosecuted by the

3    government due to his ideology and belief.  That's the long and

4    short of it.  They identify people that they feel might be

5    problems, and they check them out, and they figure out that he's

6    got guns that maybe he shouldn't have.

7         THE COURT:  So --

8         MS. TAYLOR:  Yeah, go ahead.

9         THE COURT:  So you've got all of these people that have

10   supported Mr. Thomasberg for so many years and think very highly

11   of him and give a completely different side.  Nobody has any idea

12   that he's involved with this group and advocating a RAHOWA war.

13   It's just completely off the radar.  What do I do with that?

14        MS. TAYLOR:  Well, as I mentioned earlier, Your Honor,

15   these are private chat messages with his friends.  He's not going

16   around promoting racial violence.  He's not.  So why -- it's not

17   like he's sitting at the dinner table saying, Hey, mom, I think

18   I'll go shoot up a synagogue today, because that's not what he

19   believes.  So, if he's talking --

20        THE COURT:  Well, what about going down to a mall and

21   screaming the N-word when he sees black individuals and going,

22   Yeah, I screamed at the top of my lungs and nobody did anything,

23   and so I'm empowered that way?  That's public.

24        MS. TAYLOR:  That's what he says happened.  There's

25   actually no proof that that happened, Your Honor.  This is my

1    point.  He is exhibiting grandiosity among his friends that he

2    thinks will follow those similar beliefs and thinks that's cool.

3    You have to take into account his age.  That's a huge issue here.

4    I mean, 14 when he had the prior incident, and when he's writing

5    most of these text messages I think he's around 19.  Now he's

6    about to turn 22.  His brain obviously is not fully formed yet.

7    There's no doubt.  And he does have symptoms of autism.  He said

8    it to the probation officer preparing the report, and I think

9    it's consistent with what his family would say, that he has never

10   felt that he's fit in.  He just doesn't.  He's a little bit

11   awkward in social situations, but it's more than just a little

12   bit awkward, so he seeks out people who were like him.  I think

13   it makes him more susceptible to these kinds of recruiting by

14   these extremist groups, but I don't think he was shouting it from

15   any mountaintop at all.  I don't think that's what was happening

16   here.  I think he had these beliefs about this, you know, coming

17   holy war that he doesn't even espouse now, right; that, you know,

18   it's part of growing up.  You try on new hats and see if they

19   fit.  They don't fit.  He's never been raised to believe that, he

20   doesn't believe that, but he has made it seem like he does in his

21   chats with his friends.  But you notice the government's not

22   claiming that he actually did anything illegal in the rally in

23   Charlottesville or, you know, actually in public espoused

24   violence.

25          THE COURT:  But he's about -- you know, when he gets

1  arrested he's about to enroll with a new group, the Patriot

2  Front, but now standing here today he says I'm not involved, I

3  don't intend to be involved in any of those groups ever again.

4  　　　MS. TAYLOR:  Correct.

5  　　　THE COURT:  And so what do I -- what's the -- what

6  happened?

7  　　　MS. TAYLOR:  Well, number one, he's been sitting in jail

8  for over five months.  That happened.  This has been a huge thing

9  for him.  I think the only other time is when he was in JDC for a

10  couple of days, juvenile, you know.  This has been a turning

11  point in his life.  He now realizes he can never be in possession

12  of a gun.  That's a big deal for him, and he's voluntarily taken

13  that step.  The government didn't have to put him through a

14  trial.  He came in here and pled guilty and said, Yes, I know the

15  result of this means I will never possess a firearm again, and

16  he's okay with that.

17  　　　So he's reshaped his whole worldview.  I think he's

18  actually kind of enjoyed getting to know all the different people

19  in the jail.  They come from all walks of life.  He's lived a

20  pretty sheltered life.  You know, he grew up primarily in McLean

21  in Loudoun County, and he has not had, maybe, exposure to as many

22  people as the typical -- as the typical person his age has.  So,

23  you know, he has had more exposure now, and that has been a good

24  thing for him, but the Patriot Front, I think, is more of a

25  reaction to breaking up with his girlfriend and whatever.  I

1  don't think they espoused violence, per se.  He never actually

2  did anything with them, but I think there has been a huge shift

3  since he was arrested, and I think even Mr. Baynes, I believe,

4  didn't actually renounce his association after his arrest.

5  That's my understanding.  I think, you know, they've all had

6  come-to-Jesus moments with this whole thing and realized it's not

7  okay.  It's not okay.

8          But, essentially, what the Court has been asked to

9  sentence my client on today is filling out a false statement on a

10  firearm application and also being in possession of guns during

11  the time he was also using substances.  And he was not a daily

12  user by any means, but he has experimented with lots of drugs

13  over the course of his lifetime.  I'm not saying he doesn't have

14  a substance abuse problem, he clearly does, but it's not like he

15  was, you know, a heroin addict that had to get his fix every day.

16  It wasn't like that at all.  He was looking for solutions to his

17  chronic Lyme disease and the pain associated with that.  It's

18  been a real struggle for him, and it's been a huge issue in the

19  jail.  They can't manage it here.  He has suffered a lot, and I

20  think that causes you to appreciate your freedom more than

21  others.  When he says it's been harder for me than the average

22  Joe, what he means by that is because of his medical issues he

23  feels like this incarceration has been harder on him, and he's

24  anxious to return back to his lime protocols so he's not in

25  constant pain as he has been.

1      I would ask the Court to take into account that the reason

2  why his case and Brian's case, Brian Baynes' case are in

3  different positions is because the government controls the

4  narrative.  They control the process, obviously.  They chose to

5  arrest Brian first so he could get information on Andrew.  If

6  they did it in reverse, Andrew would have given information about

7  him.  Neither one of them is a liar.  They both told the truth.

8  Brian was every much as involved in that transaction as Andrew

9  was.  So, because he has one charge versus two, that's totally

10  the government's doing.  They could charge Andrew with seven

11  charges for seven guns.  I mean, you know, they control that.

12  That doesn't make their case different or the facts of their case

13  different.  They both espoused the exact same ideology.  They

14  both had the same types of guns.  They both had a lot of

15  ammunition, all those kinds of things, and they both had a

16  criminal history one.

17      I do not think it is a huge, significant difference of one

18  event that happened when my client was age 14, a freshman in high

19  school.  I don't.  And even if -- obviously, the Court can take

20  into account that in determining what a fair sentence is,

21  obviously, but a sentence of time served, I do believe, avoids

22  unwarranted sentencing disparity with Mr. Baynes.  If you take

23  into account -- for example, let's say -- let's say,

24  hypothetically, the average defendant gets a 50 percent time cut

25  when they cooperate.  Well, he ends up with a 30-day intermittent

1   sentence.  Would the Court have given him 60 days but for that?

2   So the government now wants to go for let's use that as a

3   comparison, then.  How does that compare to 18 months

4   recommendation for my client?  I mean, it's well, well different,

5   and the difference is based on what?  Brian's in all these same

6   conversations.  Brian has guns, too.  Like, there's really no

7   significant difference that would justify that much difference in

8   sentence.  The five and a half months he served is more than

9   enough.  It is very close to what a Guideline sentence would be

10  if you take into account a Zone C disposition, meaning six months

11  incarceration and six months alternative to incarceration like

12  home detention.

13      If you do this, he's very close to that six months

14  already, and I would ask the Court, would another three weeks

15  make a difference?  If he changes to a BOP inmate today, what are

16  they going to do with him for three weeks, have him on a bus

17  somewhere going from here to there?  It's not going to serve any

18  purpose.  I would assert that any purpose that's going to be

19  served by incarceration has already worked its magic on this

20  young man.  He has never done this before, and it has made a

21  significant difference to him.  And even if the Court gives him a

22  split sentence and only gives him six months incarceration, it's

23  essentially the same as what it is now.  He could be on home

24  detention and be very closely monitored by the probation

25  department, and that still would be a Guideline sentence, but I

1    don't think the Guidelines are the be-all to end-all in this

2    case.  I don't think that the Court has to follow the Guidelines.

3    Obviously they're a recommendation.  I think it's more important

4    to avoid unwarranted sentencing disparities.

5         Andrew, as I talked about, you know, he is very smart.  He

6    gets exactly what's happening, and I believe that he will change

7    his ways.  He is very excited to start his future.

8         He needs, obviously, some more educational training.  He

9    was signed up, paid for, to attend EMT training.  I think it was

10   the week after he was arrested the classes were to begin.  He

11   would still like to do that.  He does need some further

12   counseling and psychiatric treatment.

13        I think that there have been several major issues in his

14   family and background, both with dealing with his kind of

15   upbringing and the turmoil in his family, but also the PTSD and

16   acute stress disorder from the suicides of his friends when he

17   was 18, and, you know, how all this interplays with Asperger's

18   autism, as well as his unique circumstances.  I think he needs

19   continuing counseling and a psychiatric evaluation.  He obviously

20   needs continuing medical treatment, and all these things are best

21   accomplished outside of the Bureau of Prisons' system.  I can

22   confirm that the jail has not been able to manage the chronic

23   lime.  Obviously, it doesn't help with -- jail is not helping him

24   get any kind of psychological treatment.

25        And even if the Court followed the government's

1    Guidelines, none of those things are going to be accomplished in

2    that short of time in the Bureau of Prisons, and they can't be

3    done well anyway.  And if we are trying to make sure that Andrew

4    lives a straight path from now on, the best way to do it is to

5    make sure he's managed medically and psychologically, and the

6    jail is only exacerbating that, not assisting in that endeavor at

7    all.

8         So I would ask the Court to consider all those factors but

9    primarily consider the sentencing disparity between his case and

10   Brian Baynes' case.  I pointed out another case in D.C.  All

11   these guys know each other.  That's why I said that I'm sure that

12   Mr. Clark had something to say about Mr. Thomasberg and vice

13   versa, and the government in that case was asking for a time-

14   served disposition, and he just happened to be locked up longer.

15   It's a slower process than we have here in the Eastern District

16   of Virginia, but regardless, I did put that quote in from the

17   judge because I thought it was perfect.  I felt this whole case

18   that the government has really been pressing this case because of

19   my client's extremist idealogies that have been expressed in the

20   past in text messages, and the judge in the D.C. case we do not

21   -- said we do not punish people for the hate they have in their

22   hearts, and I think we all believe that, but practice and actions

23   speak louder than words.  Thank you, Your Honor.

24        THE COURT:  All right.  Thank you.  All right,

25   Mr. Thomasberg, come to the podium, sir.  This is your

```
 1    opportunity to tell me anything that you would like to before I

 2    sentence you, and please remain there when you're done.

 3         THE DEFENDANT:  I would just like to say to the Court that

 4    I apologize for all of my actions that have led up to this

 5    moment.  This has been a very humbling experience, and my life

 6    will not resume the same walk.

 7         THE COURT:  You're a really potentially frightening person

 8    to our community.  I mean, it's really -- praising mass murderers

 9    and screaming racial slurs in public, you know, that -- people

10    with depraved minds do that, people that are so far off the

11    community norms and people who just don't understand that we're

12    an inclusive population and not an exclusive one.

13         What have you been doing to try and think about where you

14    were at the time of your arrest versus where you are today?  You

15    know, I read with interest the fact that you're over at the

16    detention center and you're sitting around folks who are MS-13

17    people or Crips and Bloods, and they're all fine with you and

18    you're all fine with them, but, I mean, have you gone deeper?

19    Have you really thought about how far out there you had gotten

20    and how dangerous that is?

21         THE DEFENDANT:  I have, Your Honor.

22         THE COURT:  And what have you decided?  What -- where are

23    you going to be going forward?

24         THE DEFENDANT:  As the prosecution has made it known, I

25    have not formally renounced my former ideology, but I certify
```

1    here today that I do.

2            THE COURT:  All right.  No more chat rooms with

3    extremists?

4            THE DEFENDANT:  Correct, Your Honor.

5            THE COURT:  You know, you've had counseling over the years

6    of your youth for a number of different reasons, and I'm very

7    thankful that you got counseling for those events in your life,

8    which have been significant, but now you need to face the fact

9    that you need mental health counseling moving forward for the

10   reasons -- whether it's the PTSD or the other stressors, but you

11   need to make sure that you follow the regimen of the mental

12   health experts who are going to be working with you in the

13   future, and that you really appreciate how fortunate you are to

14   be in the community -- and you'll be there shortly -- and how

15   fortunate you are to have the support and love of your family,

16   notwithstanding what you've been disclosed as having said,

17   letters from, you know, African-Americans who are close family

18   members who have said that they're shocked by this conduct, and

19   that they support you and they know that in your heart you're not

20   a racist.  Those people need to be your support moving forward.

21           It doesn't really matter whether I give you 12 months or

22   10 months or 18 months, you'll be out soon and you'll be on

23   probation for three years, and that probation officer is also

24   going to be there to help you and provide the support you need

25   moving forward, and I hope very much that you'll take advantage

1   of that.

2          I will tell you, without question, that I'll be here, if

3   you don't uphold the conditions of your supervised release.  If

4   you come back before me and there's more history of this kind of

5   action, then you can count on just going back to the

6   penitentiary, and that's a promise.  So, you've got the carrot

7   and you've got the stick.  The carrot is going out on probation

8   and doing what you need to do to make sure that you become a

9   contributing member of our community.  I'm behind the scenes, and

10  I guarantee you, if you screw up, you're not going to like what

11  happens to you.  Do we understand each other?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  All right.  I think Ms. Taylor has made --

14  both Ms. Taylor and Mr. Mariano made excellent points, as I knew

15  they would as the advocates that they are, and I'm -- I must

16  consider the sentence that Mr. Baynes received but also the

17  offenses that you've been convicted of.  You know, purchasing

18  firearms while you are using drugs, as well as the arrangement

19  you had with Baynes, that was unlawful in acquiring that other

20  firearm, and also the -- even though you were 14, the fact that

21  you discharged that weapon when you weren't in a position of

22  using it for self-defense, those are -- they change the equation

23  under the 3553 factors of the appropriate sentence for you, and

24  so I'm going to sentence you to 12 months of incarceration, three

25  years of supervised release on each of the two counts to run

1  concurrently, $200 special assessment.  I'll not impose fines or
2  costs because I find you're unable to afford them.  The special
3  conditions of supervised release are that you submit to mandatory
4  drug testing and treatment under the direction of the probation
5  officer; mental health counseling and treatment under the
6  direction of the probation officer; that you not possess a
7  computer or have access to online services without the approval
8  of the probation office; that you not possess, view, or access,
9  or otherwise use material that reflects extremist or terrorist
10  views or is deemed to be inappropriate by the probation/pretrial
11  services officer; that you not possess any weapons -- as you
12  know, it's unlawful for you to possess weapons in the future --
13  and also not possess the other parts of weapons, including the
14  components or magazines and ammunition.

15       I'll give you credit for time served awaiting sentencing.
16  I'm not sure that the sentence is long enough where he would be
17  designated.

18       MS. TAYLOR:  He will be designated somewhere, Your Honor.

19       THE COURT:  You think he will?

20       MS. TAYLOR:  I would ask you to add one day to that

21  sentence to make it 12 months and one day, if the Court would,

22  please.

23       THE COURT:  I'll do that, which will make you eligible for

24  parole a little sooner.  Do you have a designation, then?

25       MS. TAYLOR:  Just as close as possible to Northern

1   Virginia, perhaps Morgantown.

2           THE COURT:  All right.  I don't think there's any mental

3   health capability at the BOP at all, certainly for that brief

4   period of time.

5           MS. TAYLOR:  Right.

6           THE COURT:  All right.  So it's up to you, and I hope that

7   you're sincere in your beliefs in how you're going to live your

8   life moving forward and that you work really hard at appreciating

9   that we're one society, and it's not made up of individuals, it's

10  make up of our collective country.

11          And if you study our history, you'll realize that we for

12  200 years have been a collection of people coming from all over

13  the world, and that's what makes us the greatest country in the

14  world.  Open your eyes and see that, and if you do that, you're

15  bright, you've got great support from your family, and good

16  things will happen.  So be vigilant and make it happen, all

17  right, sir?

18          THE DEFENDANT:  All right, Your Honor.

19          THE COURT:  Okay.  All right.  Good luck to you.  Thank

20  you, Ms. Taylor.  Mr. Mariano, thank you.

21          (Proceedings adjourned at 10:43 a.m.)

22

23

24

25

1

2

3

4

**C E R T I F I C A T E**

5

6          I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
7   proceedings in the above-entitled matter.

8

   /s/ Scott L. Wallace                    4/21/20
9   ----------------------------      ----------------
   **Scott L. Wallace, RDR, CRR             Date**
10   **Official Court Reporter**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25